**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                        )
UNITED STATES OF AMERICA,               )
                                        )
        v.                              )
                                        )        Crim. Action No. 23-0206 (ABJ)
STEVEN GORHAM,                          )
                                        )
                Defendant.              )
_____)

## MEMORANDUM OPINION AND ORDER

In this case, Metropolitan Police Department ("MPD") officers peered into the defendant's unoccupied parked car with the aid of a handheld flashlight, observed a weapon, and forced the car open in order to recover it.  Defendant's attempt to suppress the firearm began as a vague smorgasbord of theories, but it eventually crystallized into a motion based primarily on the Supreme Court's decision in _United States v. Jones,_ 565 U.S. 400 (2012), and the theory that the officers committed a common-law trespass in violation of the Fourth Amendment by touching the car for the purpose of gathering information. The Court finds that the _Jones_ decision does not go so far as to reach the officers' non-invasive interactions with the defendant's car; nor was the unoccupied automobile "seized" by the officers in violation of the Constitution.  While this opinion should not be read as a ringing endorsement of the MPD operation at issue, the motion to suppress will be denied.

## BACKGROUND

On October 7, 2022, at approximately 6:52 p.m., officers from the Metropolitan Police Department's Violent Crime Impact Team were dispatched to the Woodland Terrace Public Housing Complex in Southeast D.C.  Gov't Opp. to Def.'s Suppl. Br. ("Gov't Suppl. Opp.") [Dkt.

#37] at 1; Def.'s Suppl. Br. [Dkt #34] ("Def.'s Suppl. Br.") at 6.  The complex is comprised of multiple two-story buildings that each contain several units, and the buildings and their respective parking lots are spread out over a several block area.  *See generally* Officer Schemmel Body-Worn Camera Clip, Gov't Hrg. Ex. 1 ("Gov't Ex. 1").  Approximately ten to fifteen officers arrived in three unmarked patrol vehicles and on foot.  Def.'s Suppl. Br. at 6.  Officers Thomas Schemmel and Bryan Madera testified that they were sent to the neighborhood that day to conduct community engagement and gun interdiction, with a "primary focus . . . to try and find unregistered firearms within the community."  Tr. of Proceedings Oct. 2, 2023 [Dkt #32] ("Oct. 2 Tr.") at 17–18, 135. The officers were not responding to any reports of gunfire or citizen complaints at time; they had been sent to the scene as part of a site-specific canvass undertaken as part of the Team's gun interdiction efforts.  Oct. 2 Tr. at 57, 164.

Upon arrival, the officers dispersed and began conducting a walkthrough near the public parking lot in front of 2744 Bruce Place SE, Washington, D.C. 20020.  Oct. 2 Tr.at 17, 68–69. The officers examined the public areas surrounding the lot with the aid of flashlights, and they looked into the interiors of several parked, unoccupied vehicles.  *See* Oct. 2 Tr. at 69–70, 162.  The officers were equipped with body-worn cameras at the time, and their movements can be observed on Government Hearing Exhibits 1–5 and Defendant's Hearing Exhibits 2–4, 6, 7B, 8–10, 12–13, 15B–18, and 21–26.

During the course of the evening, Officer Schemmel walked around a black Dodge Charger, later identified as belonging to defendant, and he looked into its tinted windows from various angles with the aid of a flashlight.  Oct. 2 Tr. at 22–23, 26; Officer Schemmel Body-Worn Camera Clip, Gov't Hrg. Ex. 2 ("Gov't Ex. 2").  According to Officer Schemmel, he remained "standing on the ground" during the entire examination of defendant's car, Oct. 2 Tr. at 30–31,

and the defendant has not pointed to any evidence to the contrary.  It is apparent from Officer Schemmel's body-worn camera footage that the interior of the vehicle became visible to him when he held up the flashlight.



Gov't Ex. 2 at 18:55:07.

However, the same footage also reveals that Officer Schemmel and another officer made physical contact with defendant's car during this process.  For example, in Officer Schemmel's body-worn camera video, Officer Schemmel can be seen grasping a flashlight with his right hand and resting that same hand on the windshield of defendant's vehicle, Gov't Ex. 2 at 18:55:27– 18:55:30, while a second officer simultaneously cups his hands around his eyes, and the edge of each hand is pressed directly against the front passenger-side window while he looks inside.  *Id.*



Gov't Ex. 2 at 18:55:30.  Evidence established during the suppression hearing also confirmed that

Officer Schemmel looked into the car after another officer, Officer Madera, had already done so.

Oct. 2 Tr. at 72:13–73:8; *see* Def.'s Ex. 4 (Madera body-worn camera video).

On cross-examination, Officer Schemmel acknowledged what had taken place:

Q:  And is it your practice to look into vehicles multiple times?
A:  Yes, ma'am.
Q:  With multiple officers?
A:  Yes, ma'am.
Q:  Okay.  And why is that?
A:  Just like anything, it's always better to have a second set of eyes look at something.
Q:  You watched some of your fellow officers conduct these flashlight searches, correct?
A:  I have.
Q:  Some of them will put their hands on the vehicles, correct?
A:  Yes, ma'am.
Q:  And press the flashlight against the window –
A:  Yes, ma'am.
Q:  -- in order to get a better look, if you will?
A:  Yes, ma'am.

Oct. 2 Tr. at 73–73.

After looking into the front of the car, Officer Schemmel walked around to the rear driver-side window and again used his flashlight to observe the interior.  Gov't Ex. 2 at 18:55:33–18:56:02.  Camera footage reveals that Officer Schemmel was not touching the vehicle at that point, but instead hovering next to the vehicle while grasping his flashlight in one hand and cupping his other hand against his face:



Gov't Ex. 2 at 18:56:02.  Officer Schemmel then called out "1-800," a signal to alert others to the presence of a firearm.  Gov't Ex. 2 at 18:56:05–18:56:08.  Officer Schemmel testified that he made the announcement upon seeing the handle and rear sights of a handgun sticking up out of the rear seat pocket of the front passenger seat.  Oct. 2 Tr. at 19.

Law enforcement officers later opened the vehicle and retrieved a black Smith and Wesson handgun from the pocket on the back of the passenger seat.  *See* Gov't Suppl. Opp. at 2; Oct. 2 Tr. at 49.  It had one round in the chamber and seventeen rounds of ammunition in an extended magazine.  Oct. 2 Tr. at 49.  They also found defendant's Maryland driver's license in the car,

along with several other documents bearing his name, including billing material and an identification card. Oct. 2 Tr. 42–48. They made no arrests at the time. Oct. 2 Tr. at 34. Investigators later obtained a warrant to take an oral swab from the defendant to use for DNA comparison purposes. Def.'s Mot. to Suppress Tangible Evid. [Dkt. # 17] ("Def.'s Mot.") at 3. He was indicted by a federal grand jury in June of 2023 and charged with unlawful possession of a firearm and ammunition by a felon in violation of 18 U.S.C. § 922(g)(1). *See* Indictment [Dkt. # 1] at 1.

## PROCEDURAL HISTORY

On August 7, 2023, defendant filed a motion to suppress the firearm, as well as any evidence obtained pursuant to the warrant for the buccal swab, on the grounds that the warrantless seizure of the weapon violated the Fourth Amendment, and the DNA sample was the fruit of that constitutional violation. Def.'s Mot. at 1. The precise theory underlying the motion was unclear; the defense maintained that "Mr. Gorham's vehicle was seized when three cars full of armed officers surrounded the vehicle both with their vehicles and themselves, preventing any egress[,]" *id.* at 6, and that the officers had undertaken a search that could not be sustained under either the automobile or the plain view exception to the warrant requirement. *Id.* Defendant also complained that there was no "particularized indication" that the vehicles in the parking lot had been associated with criminal activity; "[t]he officers were simply searching cars on a whim to see what they might find." *Id.* Defendant observed that "officers used flashlights and at times made physical contact with the vehicle to look intently inside the tinted windows at the vehicle's content," *id.* at 6, but he did not identify any authority or legal doctrine to support an argument that such conduct would be unlawful. The government opposed the motion, taking the position that the weapon was in plain view, and that under Supreme Court precedent, the use of the flashlight alone did not transform

6

the officers' observation of the interior of the car into a "search" for purposes of the Fourth Amendment.  Gov't Opp. to Def.'s Mot. [Dkt. # 24] ("Gov't Opp.").  Defendant filed a reply. Def.'s Reply to Gov't Opp. [Dkt. # 29] ("Def.'s Reply").

The Court heard argument on October 2, 2023, and at the close of the evidence, defense counsel contended that the Fourth Amendment was violated when the officers pulled up in their cars and blocked ingress and egress from the parking lot – in effect, seizing the parked cars without the reasonable suspicion necessary to support a *Terry* stop.  Oct. 2 Tr. at 179–82.  Counsel suggested that there may be "an equal protection issue at play," but failed to articulate how those considerations bore on the motion to suppress.  Oct. 2 Tr. at 166; *see also id.* at 9 ("We have a public housing community comprising of a lower socioeconomic class of people whose rights have been essentially relegated to unimportant -- I think we would all agree this would not happen in the Palisades.").  Counsel also maintained that the case fell outside the plain view exception given the particular facts and circumstances here:  that the officers pressed the flashlight "up against the

glass, . . . making contact with the vehicle, lingering, having one officer doing a pass . . . [and] another officer coming back around." *Id*. at 185–86.[1]

The Court invited both parties to supplement the record with additional authority. *See* Oct. 2 Tr. at 182; Minute Order (Oct. 2, 2023).  On October 24, defendant filed a supplemental brief, Def.'s Suppl. Br., this time predicating the motion on *United States v. Jones,* 565 U.S. 400 (2102), and its progeny, and the government filed another brief in opposition.  Gov't Suppl. Opp.  Given the evolving nature of the legal theories at issue, the Court convened another hearing on November 14, 2023 before taking the matter under advisement.  Minute Entry (Nov. 14, 2023).

---

[1]    Defense counsel also conceded at the first hearing that the officers were lawfully present given the location of the vehicle in a public housing complex. Oct. 2 Tr. at 182–83. (Q:  "[T]here's the three-pronged [test] about whether [the police] can see [the seized evidence] in plain view, whether its incriminating character was immediately apparent, [and] whether [the police] were lawfully there in the first place.  Were [the police] lawfully there in the first place?" A:  "It is public housing, Your Honor.  I think we do take umbrage with the obviously incriminating piece.").  However, the government pointed out that even if the defendant had a license to carry the firearm, or the gun was registered, the transportation of a loaded firearm that was accessible from the passenger seat, and that was not hidden from public view, contravened multiple provisions of the D.C. Code and D.C. Municipal Regulations.  *See* Gov't Opp. at 10–11, citing D.C. Code § 22-4504.02(b) ("(1) If the transportation of the firearm is by a vehicle, the firearm shall be unloaded, and neither the firearm nor any ammunition being transported shall be readily accessible or directly accessible from the passenger compartment of the transporting vehicle.  (2) If the transporting vehicle does not have a compartment separate from the driver's compartment, the firearm or ammunition shall be contained in a locked container other than the glove compartment or console, and the firearm shall be unloaded."); D.C. Municipal Regulation § 24-2348.2 ("When not in storage, each registrant shall carry the firearm on his or her person or within such close proximity that he or she can readily retrieve or use it as if he or she carried it on his or her person; provided, that the firearm is entirely hidden from view of the public."); and § 24-2344.1 ("A licensee shall carry any pistol in a manner that it is entirely hidden from view of the public when carried on or about a person, or when in a vehicle in such a way as it is entirely hidden from view of the public.").

## LEGAL STANDARD

The Fourth Amendment to the United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. Const. amend. IV. This protection extends beyond the walls of a private dwelling and into "every container that conceals its contents from plain view," including vehicles. *United States v. Ross*, 456 U.S. 798, 822–23 (1982). "A warrantless search is the quintessential intrusion and is presumptively unreasonable" under the Fourth Amendment. *United States v. Peyton*, 745 F.3d 546, 552 (D.C. Cir. 2014). The government therefore bears the burden of justifying the warrantless search through the applicability of an exception to the warrant requirement. *See, e.g.*, *United States v. Jeffers*, 342 U.S. 48, 51 (1951), and *United States v. Mangum*, 100 F.3d 164, 169 (D.C. Cir. 1996).

## ANALYSIS

The Supreme Court's decision in *United States v. Jones*, 565 U.S. 400 (2012), frames the parties' dispute over the propriety of the officers' conduct and whether the fruits of that conduct must be suppressed.[2] According to defendant, "[t]he Supreme Court was clear in *Jones*[] that a

---

2    While the defense did not press the argument at the second motion hearing, in the first section of his supplemental brief, defendant also argues that the firearm was the fruit of an unconstitutional seizure of his car. Def.'s Suppl. Br. at 1 ( "Officers seized Mr. Gorham's vehicle when 10-15 armed police officers parked three police vehicles in a manner that prohibited ingress and egress from the public housing parking lots, descended upon the parking area, and began searching inside containers and vehicles with flashlights absent reasonable suspicion or probable cause."). He insists that "[c]ourts have long recognized that police action blocking in a car constitutes a seizure of the vehicle," *id.* at 12, pointing to a series of cases, including *United States v. Gross*, 662 F.3d 393 (6th Cir. 2011), but those authorities do not support his position.

First of all, as defendant's own summaries of the cases reveal, *see* Def.'s Supp. Br. at 12–14, the decisions in *Gross, United States v. Kerr,* 817 F.2d 1384 (9th Cir. 1987), *United States v. Jones,* 759 F.2d 633 (1st Cir. 1985), *Pane v. Gramaglia,* 509 Fed. Appx. 101 (2nd Cir. 2013), *United States v. Delaney,* 955 F.3d 1077 (D.C. Cir. 2020), and *United States v. Johnson,* 212 F.3d 1313 (D.C. Cir. 2000), concerned whether the *defendants* had been seized for purposes of the Fourth Amendment, not their vehicles. For example, in *Gross,* a police officer "parked his police vehicle directly behind [a legally parked] Oldsmobile and turned on his vehicle spotlights" in an effort to see how the defendant would react. *See* 662 F.3d at 396. He then approached the car and asked the defendant a series of questions. *Id.* at 397. The Court found that blocking in the vehicle "would cause a reasonable person not to feel free to leave the area," and that the encounter constituted a "seizure" of the defendant requiring reasonable suspicion under *Terry v. Ohio,* 392 U.S. 1 (1968). *Id.* at 399. Notably, in *Gross, Kerr, Jones, and Delaney,* the defendants were *in* their cars when the police pulled in behind them. *See id.* at 300; *Kerr,* 817 F. 2d at 1386; *Jones,* 759 F. 2d at 640; *Delaney,* 955 F.3d at 1079–80.

The defendant did cite one case in which the driver had left the car after it was parked, but it, too, was about whether the *driver's* liberty had been curtailed; it does not stand for the principle that the police action in that case amounted to an unconstitutional "seizure of the vehicle." In *United States v. Green*, 111 F.3d 515 (7th Cir. 1997), the police were following a car, and after the defendant David Green, who was driving, pulled into a driveway and began walking, the officers pulled their car in behind his. *Id.* at 517. The defendant's brother remained in the car. *Id.* The officers then approached the driver in the street. *Id.* After they spoke with him and allegedly obtained his consent, they searched the vehicle. *Id.* Among other findings, the court held that the officers had indeed "stopped" the Greens for *Terry* purposes:

> [W]hile in some circumstances a driver may stop his automobile on his own resulting in a consensual encounter . . . , the officers pulled their car in behind the Greens, blocking the car's exit. Under these circumstances, a reasonable person would not feel that he was free to leave. Thus, for purposes of the Fourth Amendment, the officers stopped the Greens – it was not a consensual encounter.

111 F.3d at 520 n.1 (citations omitted). The only case cited in which the court found that the vehicle itself was seized is an unreported decision from the Northern District of California, *United States v. Nunn,* Case No. 14-cr-636-TEH, 2015 WL 3764181 (N.D. Cal. June 16, 2015).

Here, the defendant was not seated in the car, and the officers did not confront or detain the defendant on the street, so there is no need to determine whether they had the level of suspicion needed to impede *his* movements. And there can be no concern as to whether, "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave," *United States v. Mendenhall,* 446 U.S. 544, 554 (1980), because defendant did just that. Body-worn camera footage reveals that the defendant was not in his vehicle, but he was standing with a group of others nearby when the officers arrived. *See* Gov't Ex. 1 at 18:53:26–18:54:04. He then calmly left the scene when the officers began canvassing the area. Oct. 2 Tr.

search occurs the moment officers physically intrude onto an individual's property for the purpose of gaining information." Def.'s Suppl. Br. at 17, citing *Jones* at 565 U.S. at 404–05. And the defense argues, in reliance on *Jones* and three cases from other circuits applying that decision, that "a search occurred when officers physically touched Mr. Gorham's car with their hands, faces, bodies and flashlights, in order to better see and gather information about the contents inside his vehicle." Def.'s Suppl. Br. at 15.[3] The government counters by distinguishing *Jones* and relying on a series of cases holding that the use of a flashlight to aid officers in their inspection of what is

---

at 144 ("[Defendant] was hanging out behind the vehicle. When we started looking into the vehicle, he walked away and disappeared.").

Moreover, the video evidence does not support the defendant's core factual contention that the positioning of the police cars "prohibited ingress and egress from the public housing parking lots." Def.'s Suppl. Br. at 1. It is obvious from the video evidence and defense exhibits 1, 5A, and 11 that much of the parking area in the complex was entirely unaffected, and that cars could get by the two unmarked polices cars parked in the alley. It is true that one police car pulled up perpendicular to and behind two cars that were parked in head-in spaces, blocking the defendant's car and another car in, but the evidence also reveals that they moved the car when the driver of the vehicle next to defendant's announced that she wanted to leave. *See* Officer Schemmel Body-Worn Camera Footage, Def. Hrg. Ex. 2 ("Def. Ex. 2") at 19:03:18–19:03:26 (body-worn camera footage depicting departure of vehicle from parking lot); *see also* Oct. 2 Tr. at 62 ("Q: So the Benz, she attempted to leave, correct? A: Correct. Q: And she asked the officers to move the car because she could not leave with it parked there, correct? A: Correct. . . . A vehicle could fit through there. Q: Okay. . . (Video played.) So there one of the other officers moved the vehicle out of the way, correct? A: Yes, ma'am. . . . Q: And she's leaving out the exit there. You can see kind of between those two curbs, correct? A: Yeah, . . . .").

3       During the second hearing, defense counsel agreed that the relevant time period for purposes of the motion was from the moment the officers began their canvass until the moment Officer Schemmel signaled the presence of a firearm in defendant's car. Tr. of Proceedings Nov. 14, 2024 ("Nov. 14 Tr.") (Rough Tr.) at 10 ("THE COURT: So let's go to the facts of this case . . . and I'm not interested in what other officers did to other cars or what other officers did to this car after he said 1-800 because at that point would you say that he had alerted the other officers to the presence of a gun and then there was more cause for them to look? Would that be fair?" [Defense Counsel]: (Nods head.) THE COURT: "All Right. You're nodding.").

otherwise in plain view does not constitute a "search" at all.  *See* Gov't Suppl. Opp. at 8–11.[4]  But the cases the government proffered pre-date *Jones,* and they do not address the central question raised by defendant:  whether the officers' touching of his vehicle – with their hands, faces, and flashlights – for investigative purposes somehow makes this case different.  Therefore, it is essential to determine whether *Jones* altered the Fourth Amendment landscape in a manner that would call for a different outcome.

Jones arose out of a narcotics investigation in which law enforcement officers attached a GPS tracking device to the underside of a vehicle controlled by the defendant.  *Jones*, 565 U.S. at 403.  The government utilized the device to track the defendant's movements for a month, generating evidence that resulted in a multiple-count indictment against him.  *Id.*  The defendant moved to suppress the evidence obtained from the GPS tracking device, but his motion was denied, and he was eventually convicted.  *Id.* at 403–04.  His conviction was overturned by the D.C. Circuit on appeal in a decision entitled *United States v. Maynard*, 615 F.3d 544 (D.C. Cir. 2010), in which

---

4      *See United States v. Dunn*, 480 U.S. 294 (1987) (officers utilized flashlight to observe interior of barn located within defendant's property to discover existence of drug laboratory); *Texas v. Brown*, 460 U.S. 730 (1983) (officer stopped defendant's automobile at a routine driver's license checkpoint, asked him for his license, and shined his flashlight into the car, thereby discovering contraband); *United States v. Allen*, 573 F.3d 42 (1st Cir. 2009) **(**officer utilized flashlight to inspect interior of while "leaning over the hood and shining his flashlight into the window"); *United States v. Willis*, 37 F.3d 313 (7th Cir. 1994) (in response to complaints of a disturbance in a schoolyard, officer utilized flashlight to inspect interior of a car parked in the school parking lot to discover firearm); *United States v. Gonzalez-Acosta*, 989 F.2d 384 (10th Cir. 1993) (Border Patrol agents utilized mirror and flashlight to inspect underbody of vehicle, discovering that gas tank had been altered to conceal narcotics); *United States v. Price*, 869 F.2d 801 (5th Cir. 1989) (Border Patrol agent utilized flashlight to observe underbody of vehicle, discovering compartment containing suspiciously wrapped material); *United States v. Reynoso*, Criminal Case No. 18-cr-253, 2018 WL 6067430 (D.D.C. Nov. 19, 2018) (officer utilized flashlight during traffic stop to inspect interior of vehicle through open vehicle doors, discovering firearm magazine).

the Court of Appeals held that obtaining evidence through the warrantless use of the GPS device violated the Fourth Amendment.  *Id.* at 404, citing *Maynard*; *see* 615 F.3d at 556–65.

Applying *Katz v. United States*, 389 U.S. 347 (1967), the *Maynard* Court held that the government's continuous tracking of the defendant's location enabled by the GPS device violated the defendant's "reasonable expectation of privacy" in the totality of his movements.  *Maynard*, 615 F.3d at 555–66.  The Circuit reasoned that while an individual does not necessarily have an expectation of privacy in that which is exposed to the public, "[a] reasonable person does not expect anyone to monitor and retain a record of every time he drives his car, including his origin, route, destination, and each place he stops and how long he stays there."  *Id.* at 563.  Because the GPS device enabled the government to do precisely that, the Circuit held that the investigators should have obtained a warrant before affixing it to Jones's car.  *Id.* at 565–66.

The Supreme Court affirmed the Circuit's decision.  Importantly, though, the opinion of the Court was not based on the reasonable-expectation-of-privacy theory derived from *Katz*, which animated the Circuit's decision.  Instead, Justice Scalia invoked the doctrine of common-law trespass, to which, he explained, Fourth Amendment jurisprudence has historically been "tied." *Jones*, 565 U.S. at 405.  In order to determine whether *Jones* and its trespass analysis governs the instant situation, it is necessary to undertake a careful examination of what that decision did and did not say.

A close reading of the *Jones* opinion reveals a lack of support for the defense's assertion that "a search occurred when officers physically touched Mr. Gorham's car with their hands, faces, bodies and flashlights, in order to better see and gather information about the contents inside his vehicle."  Def.'s Suppl. Br. at 15.  First of all, the decision announced in *Jones* was "that the Government's installation of a GPS device on a target's vehicle, *and* its use of that device to

13

monitor the vehicle's movements, constitutes a 'search.'"   565 U.S. at 404 (emphasis added) (footnote omitted).  That is a very narrow and specific finding in a situation that is not analogous to this case.  One cannot distill a rule against "touching" automobiles from that two-pronged conclusion.  And even if one were to ignore the second portion of the sentence, which specifically includes the monitoring as part of the basis for the holding, one must still grapple with the Court's use of the term "installation," which was fundamental to the finding that a trespass had occurred.

Justice Scalia took great pains to make that plain:

> It is important to be clear about what occurred in this case:  The Government *physically occupied* private property for the purpose of obtaining information.  We have no doubt that such a *physical intrusion* would have been considered a "search" within the meaning of the Fourth Amendment when it was adopted.

*Id.* at 404–05 (emphasis added).  He explained that prior to *Katz*, Fourth Amendment jurisprudence was focused on common-law trespass, and that while *Katz* expanded the grounds for finding a Fourth Amendment violation, it did not supplant the old trespass concepts.  *Id.* at 406–407 ("[F]or most of our history the Fourth Amendment was understood to embody a particular concern for government trespass upon the areas ('persons, houses, papers, and effects') it enumerates.  *Katz* did not repudiate that understanding.") (footnote omitted).   Justice Scalia pointed to a concurring opinion by Justice Brennan in a prior case, which underscored that "*Katz* did not erode the principle 'that, when the Government *does* engage in physical intrusion of a constitutionally protected area in order to obtain information, that intrusion may constitute a violation of the Fourth Amendment.'"  *Id.* at 407, quoting *United States v. Knotts*, 460 U.S. 276, 286 (1983) (Brennan, J., concurring).  Again, the emphasis is upon *physical intrusion*.

The opinion of the Court in *Jones* also specifically differentiated a physical encroachment, reaching *into* a vehicle, from a mere visual inspection:

> The Government also points to our exposition in *New York v. Class*, that "[t]he exterior of a car . . . is thrust into the public eye, and thus to examine it does not constitute a 'search.'"  That statement is of marginal relevance here since, as the Government acknowledges, "the officers in this case did *more* than conduct a visual inspection of respondent's vehicle."  By attaching the device to the Jeep, officers encroached on a protected area.  In *Class* itself we suggested that this would make a difference, for we concluded that an officer's momentary reaching into the interior of a vehicle did constitute a search.

565 U.S. at 410 (emphasis in original) (internal citations omitted).  And the next paragraph of the opinion, differentiating the *Jones* situation from a trespass on an open field, again emphasizes a "physical intrusion."  *Id.* at 411 ("The Government's *physical intrusion* on [an open field] – unlike its *intrusion* on the 'effect' at issue here – is of no Fourth Amendment significance.") (emphasis added).

In sum, there is no point in the *Jones* opinion where the Court characterizes the mere "touching" of  a vehicle – even for the purpose of gathering information – as a "trespass"; the objectional conduct was the physical intrusion into, or encroachment upon, private property.[5]

It appears, then, that defendant's formulation comes not from *Jones,* but from the out-of-circuit cases cited in his supplemental brief:  *United States v. Richmond*, 915 F.3d 352 (5th Cir.

---

[5]     The Supreme Court appears to have cited *Jones* only once, and its consideration of common-law trespass principles also took note in that case of the fundamental privacy interests that attach to one's home.  In *Florida v. Jardines*, 569 U.S. 1 (2013), the Supreme Court applied *Jones* to hold that the use of a drug-sniffing dog on the front porch of a home constituted a Fourth Amendment "search."  *Id.* at 5–6.  The Court acknowledged that the common law recognized an implicit license "to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave."  *Id.* at 8.  But it held that a canine forensic investigation lay outside that license.  *Id.* at 9.  ("[I]ntroducing a trained police dog to explore the area around the home in hopes of discovering incriminating evidence is something else.  There is no customary invitation to do *that*."  *Id.* (emphasis in original).  Therefore, the Court found that the police officer's conduct, which involved a trespass on land outside the implied license to seek entry to the home, constituted a "search."  *Id.* 10.  That holding provides little guidance here.

2019); *United States v. Dixon*, 984 F.3d 814 (9th Cir. 2020); and *Taylor v. City of Saginaw*, 922 F.3d 328 (6th Cir. 2019).  *See* Def.'s Suppl. Br. at 17.  Putting aside the fact that this Court is not bound to follow any of them, none of those cases is analogous to this one on its facts.

In *Richmond*, the Fifth Circuit considered whether a police officer's pressing on a tire for the purpose of determining whether the tire contained hidden contraband was a Fourth Amendment search.  915 F.3d 352.  The panel decided that under *Jones*, a search arises where there is a "trespass . . . 'conjoined' with 'an attempt to find something or obtain information.'"  915 F.3d at 357, citing *Jones*, 565 U.S. at 408, n.5.  The panel held that the police officers' conduct met this test.  *Id.* at 358.  "In terms of the physical intrusion," the Fifth Circuit saw "no difference between the *Jones* device touching the car and an officer touching the tire."  *Id.*  And although the trespass was "relatively minor," in the court's view, it "occurred to learn what was inside the tires" and therefore "qualifies as a search."  *Id.*[6]  Importantly, the panel distinguished the situation from "mere physical touching, such as when an officer leans on the door of a car while questioning its driver," which it posited would not be a "search" under *Jones*.  *Id.* at 357.

In *Dixon*, the Ninth Circuit evaluated whether an officer's insertion of a key into the lock on a minivan was a search under *Jones*, and it concluded that it was.  984 F.3d at 820.  The court characterized *Jones* as holding "that officers could not physically intrude on a Jeep to plant a GPS

---

[6]     In advance of the Court's hearing on November 14, 2023, defendant also directed the Court to *United States v. Duncan*, 2023 WL 2403444, Criminal Action No. 22-76 (E.D. La. March 8, 2023).  Notice of Filing [Dkt. # 41].  In that case, the district court applied *Richmond* to hold that a police officer's positioning of himself  "with his arms and torso on the vehicle so that he could stretch to closely [l]ook through the darkly tinted windshield" constituted a "search."  *Id.* at *5.  "He was touching the car and the windshield to obtain more information about the car and its contents. . . . This situation is analogous to *Richmond*, and the Court finds that [the officer's] conduct constituted a trespass."  *Id.*  The case is distinguishable from the instant case as Officer Schemmel did not position his body on defendant's car.

tracking device," and it noted that *Jones* "expressly rejected the notion that the exterior of a car is entitled to less protection under" the trespass test.  *Id.*  Therefore, when the officer "inserted the key into the minivan's lock, an 'effect,' he physically intruded onto a constitutionally protected area."  *Id.*  And the physical intrusion was undertaken "for the express purpose of obtaining information, specifically to learn whether [the defendant] exercised control over the minivan. Thus, the insertion of the key into the minivan's lock constituted a search within the meaning of the Fourth Amendment."  *Id.*

And in *Taylor*, the Sixth Circuit considered the practice of "chalking," in which parking enforcement officers use chalk to mark the tires of parked vehicles to track how long they have remained in place.  922 F.3d at 330.  Officers would return to the car after a posted time for parking has passed, and if the presence of chalk marks revealed that the vehicle had not moved, they would issue a citation.  *Id.* at 330–31.  As with the Fifth Circuit in *Richmond*, the Sixth Circuit began its assessment with the "threshold question" of "whether chalking constitutes common-law trespass upon a constitutionally protected area."  *Id.* at 333.  It looked to the Restatement (Second) of Torts for guidance and explained that common-law trespass encompasses "'an act which brings [about] intended physical contact with a chattel in the possession of another.'"  *Id.*, quoting Restatement (Second) of Torts § 217 cmt. e (1965).  It added that "[a]n actor may . . . commit a trespass by so acting upon a chattel as intentionally to cause it to come in contact with some other object."  *Id.* (edit and omission in original).  Adopting that definition, the panel held that a trespass occurred "because the City made intentional physical contact with Taylor's vehicle."  *Id.*  And because the practice of chalking "amounts to an attempt to obtain information," the panel held it qualified as a "search" under *Jones*.  *Id.*

None of these opinions is binding upon this Court, and the Court finds *Dixon,* which involved a type of clear intrusion – inserting a key in the lock and operating the lock – the most persuasive of the three.   And although the Fifth Circuit saw "no difference between the *Jones* device touching the car and an officer touching [a] tire" in *Richmond*, 915 F.3d at 658, this Court is not persuaded that the invasions are comparable.   After all, it was not the touching of the vehicle in *Jones* that transformed the officers' conduct into a trespass; it was the "installation" of a GPS device, both modifying the integrity of the vehicle and enabling the government to track the defendant's whereabouts.   *Id.* at 404.   This was clearly an affront to the "inviolability" of Jones's car in a way that the treatment of defendant's car here was not.   *Id.* at 419 n.2 (JJ. Alito, Ginsburg, Breyer, Kagan, concurring).   Therefore, the Court does not find it appropriate to extend the *Jones* trespass-based analysis beyond its clear holding based on the *Richmond* decision.[7]

---

7       Furthermore, in concluding that attaching a GPS to the exterior of a vehicle was a trespass, *Jones* relied on its reading of the common law of trespass not as that tort is defined today, but as it existed in 1791 when the Fourth Amendment was ratified, and as modified by the unique customs of this country.  *See Jones*, 565 U.S. at 404–05, citing *Entick v. Carrington,* 95 Eng. Rep. 807 (C.P. 1765); *see also Jardines*, 569 U.S. at 8, citing  *McKee v. Gratz,* 260 U.S. 127, 136 (1922).  The appropriate yardstick, then, would be case law and secondary sources explaining the scope of trespass at common law, rather than the modern articulation of a trespass on chattels contained in the Restatement (Second) of Torts.  And at common law, a trespass on chattels was actionable where there was a violation of "the dignitary interest in the inviolability of chattels," irrespective of whether there is "actual damage to the chattel."  W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser & Keeton on Law of Torts 87 (5th ed.1984).

        This would suggest that officers need not damage or otherwise modify a defendant's property for the contact to amount to a trespass, and thus constitute a potential Fourth Amendment "search."  But that is not to say that the mere touching of property suffices to meet this standard in all circumstances.  As Prosser and Keeton note, whether conduct similar to that challenged here – "as where, for example, [an individual] merely lays hands upon the plaintiff's horse" without inducing harm – was actionable at common law is both a matter of dispute and the subject of "a surprising dearth of authority."  *Id.*

But even if one were inclined to take the three circuit decisions cited by defendant into account, they can be easily distinguished.  In *Richmond,* the Fifth Circuit found the touching to constitute a trespass in a situation where the touching was the means to acquire information that was otherwise inaccessible to the officers:  was there something inside the tires?  Here, the officers could see inside the car with the flashlight alone, and the touching was merely incidental to those observations.  In *Taylor,* the chalking altered the physical appearance of the vehicle – something a mere passerby would not have license to do – while here, the Dodge Charger remained unaltered as the police circled it and looked inside.  And in *Dixon,* there was an actual physical intrusion – the insertion of the key – and an operation of the locking mechanism; two interactions with the car that extended well beyond what could reasonably be expected when one parks a car on a public street.

This ruling is not only consistent with *Jones* but is further supported by the Supreme Court's consistent treatment of cars under a privacy-based approach.  As the Court emphasized in *New York v. Class*:

> [T]he physical characteristics of an automobile and its use result in a lessened expectation of privacy therein:  "One has a lesser expectation of privacy in a motor vehicle because its function is transportation and it seldom serves as one's residence or as the repository of personal effects.  A car has little capacity for escaping public scrutiny.  It travels public thoroughfares where both its occupants and its contents are in plain view."

475 U.S. 106, 112–113, quoting *Cardwell v. Lewis*, 417 U.S. 583, 590 (1974) (plurality opinion). Indeed, "[t]here is no legitimate expectation of privacy shielding that portion of the interior of an automobile which may be viewed from outside the vehicle by either inquisitive passersby or diligent police officers."  *Brown*, 460 U.S. at 40 (internal citations omitted).  Moreover, the Court has ruled that it is "beyond dispute" that shining a flashlight "to illuminate the interior of [an

individual's] car trenche[s] upon no right secured to the latter by the Fourth Amendment."  *Id.* at 739–40.

Defense counsel conceded as much at the second hearing, stating that "get[ting] up close to a window of car without touching it" and peering in would not be a trespass.  *See* Nov. 14 Tr. at 11–12.  Counsel further agreed that looking in with a flashlight without touching the window would not be a trespass.  *Id.*  And counsel agreed that officers could cup their hands around their eyes to get a better look, explaining that the Fourth Amendment would be triggered only if the edge of their hands touched the car.  *Id.*  Thus, defendant's motion turns upon whether the fact that the officers touched the vehicle in connection with their lawful exploratory use of the flashlight –

and that fact alone – transformed the activity into a search with constitutional implications.  The

Court cannot find support for that position in either Supreme Court or D.C. Circuit precedent.[8]

Finally, the Fourth Amendment's exclusionary rule is only triggered "when the

constitutional violation is "a 'but-for' cause of obtaining evidence."  *United States v. Weaver*,

808 F.3d 26, 34 (D.C. Cir. 2015), quoting *Hudson v. Michigan*, 547 U.S. 586, 592 (2006).

Although not laid out explicitly, this legal requirement is present in many of the cases defendant

cites, as the physical contact permitted the officers to learn something that was not otherwise in

plain view.  For example, in *Richmond*, the physical trespass enabled the officers to test the

composition of the tire's interior, and thus learn that the defendant was concealing something

---

[8]     Even if the Court were to find that merely touching an unoccupied vehicle parked in a public space – in an attempt to gain information, but in the absence of the sort of physical intrusion that troubled the Court in *Jones* – constitutes a "search," that in itself would not render the search unlawful.   The Fourth Amendment does not prohibit all warrantless searches, but only "unreasonable" ones.  So the Court would then have to undertake an analysis of the reasonableness of the search, which, ordinarily involves balancing the extent and nature of the trespass or intrusion on defendant's privacy, against the level of concern or suspicion that prompted the search in the first place.  *See, e.g.*, *Camara v. Municipal Court*, 387 U.S. 523, 534–535, 536–537 (1967).

Here, the intrusion was minimal, even if it can technically be characterized as a trespass. But there is no dispute that the police had no grounds to suspect that this particular car contained contraband or evidence of a crime before they started peering into it. And the evidence in the record as to the reason for the general search being conducted in the neighborhood was limited: Officer Madera testified that the neighborhood in question is "plagued with gun violence," Oct. 2 Tr. at 163, and the video evidence did reveal the presence of a memorial in a tree box to a recent victim of gun violence. Nov. 14 Tr. at 41. During the second oral argument, the government made reference to studies showing that many illegally possessed guns are stolen from cars. *Id.*; *see e.g.,* Megan J. O'Toole, Jay Szkola, and Sarah Burd-Sharpes, *Gun Thefts from Cars: The Largest Source of Stolen Guns*, Everytown (May 9, 2022), *available at* https://perma.cc/69UY-SAQ8.  But there is no evidence in the record that this animated MPD's decision to authorize or undertake the operation in question.  And even if that record had been fully developed, it is not clear whether evidence concerning broad legitimate public safety reasons underlying police activity would be what is called for when conducting the reasonableness inquiry with respect to a particular search of a particular vehicle under the Fourth Amendment.  Since the Court has not found the necessary physical intrusion, it need not engage in the analysis, and it will not as the record has not been fully developed on that point.

within.  915 F.3d at 354.  And in *Dixon*, police were able to determine that the obtained key fit into the car lock, and thus that the vehicle was in fact owned by the defendant.  984 F.3d at 818–19.

The same simply cannot be said here.  While the officers' occasional use of their hands may have facilitated or improved their ability to look inside the car, the body-worn camera footage shows that physical contact was not necessary to enable Officer Schemmel to look inside, and indeed, he was not touching the car when he saw the weapon and signaled "1-800."  Defendant has thus failed to establish that the only alleged constitutional violation – touching the car – communicated any information that was not otherwise available through the officers' lawful use of their flashlights.

The Court's decision should not be interpreted as a license for officers to descend on a neighborhood and physically engage with the parked cars in any fashion.  Whether other forms of conduct, such as climbing on top of a vehicle to peer inside, would constitute a "search" under *Jones* is not before the Court.  But it should be noted that a court in the District of Columbia recently held that it was.  *See* Tr. of Proceedings, *United States v. Alexander*, Case No. 2021 CF2 002232 (D.C. Sup. Ct. Oct. 30, 2023), Ex. in Supp. of Def.'s Mot. [Dkt. # 36-8] at 8 ("I therefore find and conclude that by climbing onto the defendant's car and putting their hands and their faces right up on the windshield to look inside for the purpose of seeing more inside than they had been able to see just from standing on the street, on the outside of the car, that that was a search within

the meaning of the Fourth Amendment.").[9]  The Court simply holds today that an officer's mere touching of a window in the course of a flashlight-enabled visual inspection does not constitute a "search" for purposes of the Fourth Amendment and *United States v. Jones*.

For the foregoing reasons, defendant's motion to suppress [Dkt. # 17] is **DENIED.**

**SO ORDERED.**

AMY BERMAN JACKSON
United States District Judge

DATE: January 10, 2024

---

9      Testimony was presented that at some point during the police officers' inspection, at least one officer climbed on top of a vehicle to look inside.  *See* Oct. 2 Tr. at 153–154.  The Court need not address that particular conduct here.  Not only did the climbed-upon car belong to someone other than defendant – thereby implicating *someone else's* Fourth Amendment rights – that conduct yielded no evidence pertaining to defendant's case.  *See id.*  Moreover, that particular event occurred *after* Officer Schemmel signaled the presence of a gun in defendant's car.  *Id.*  To the extent that the D.C. Superior Court's thoughtful decision in *Raymond Alexander*, Case No. 2021 CF2 2232 (D.C. Sup. Ct. Oct. 30, 2023), is persuasive, it is therefore easily distinguished.