UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA, )<br>)<br>v.  )<br>)<br>STEVEN GORHAM, )<br>)<br>Defendant. )<br> ) | Crim. Action No. 23-0206 (ABJ) |

**ORDER**

On October 7, 2022, at approximately 6:52 p.m., officers from the Metropolitan Police Department's Violent Crime Impact Team were dispatched to the Woodland Terrace Public Housing Complex in Southeast D.C. Gov't Opp. to Def.'s Suppl. Br. in Supp. of Mot. to Suppress ("Gov't Suppl. Opp.") [Dkt. #37] at 1; Def.'s Suppl. Br. in Supp. of Mot. to Suppress [Dkt #34] ("Def.'s Suppl. Br.") at 6. The officers were not responding to any reports of gunfire or citizen complaints at time; they had been sent to the scene as part of a site-specific canvass undertaken as part of the Team's gun interdiction efforts. Tr. of Proceedings Oct. 2, 2023 [Dkt #32] ("Oct. 2 Tr.") at 57, 164.

Upon arrival, the officers dispersed and began conducting a walkthrough near the public parking lot in front of 2744 Bruce Place SE, Washington, D.C. 20020. Oct. 2 Tr.at 17, 68–69. The officers examined the public areas surrounding the lot with the aid of flashlights, and they looked into the interiors of several parked, unoccupied vehicles. *See* Oct. 2 Tr. at 69–70, 162. During the course of the evening, an officer walked around a black Dodge Charger, later identified as belonging to defendant, and discovered through his visual inspection the presence of a firearm.

Oct. 2 Tr. at 22–23, 26; Officer Schemmel Body-Worn Camera Clip, Gov't Hrg. Ex. 2 ("Gov't Ex. 2") at 18:56:05–18:56:08.

Law enforcement officers opened the vehicle and retrieved a black Smith and Wesson handgun from the pocket on the back of the passenger seat. *See* Gov't Suppl. Opp. at 2; Oct. 2 Tr. at 49. It had one round in the chamber and seventeen rounds of ammunition in an extended magazine. Oct. 2 Tr. at 49. They also found defendant's Maryland driver's license in the car, along with several other documents bearing his name, including billing material and an identification card. Oct. 2 Tr. 42–48. They made no arrests at the time, Oct. 2 Tr. at 34, and defendant was later indicted by a federal grand jury in June 2023 and charged with unlawful possession of a firearm and ammunition by a felon in violation of 18 U.S.C. § 922(g)(1). *See* Indictment [Dkt. # 1] at 1.

Although trial is set to commence in mere weeks, defendant has filed a motion to dismiss the indictment. *See* Mot. to Dismiss Indictment [Dkt. # 50] ("Mot."). He argues that in light of the Supreme Court's decision in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), and the Third Circuit's interpretation of that case in *Range v. Attorney General United States of America*, 69 F.4th 96 (3d Cir. 2023), section 922(g)(1) is unconstitutional under the Second Amendment, and the indictment must be dismissed. Mot. at 3–8.

Defendant's motion will be **DENIED**. This Court is bound to apply clear D.C. Circuit precedent that found the federal felon in possession statute to be consistent with the Second Amendment. *Bruen* did not overrule or question that proposition, and the *Range* decision was a limited one that was based on the minor nature of the particular underlying state offense in that case.

In *Medina v. Whitaker*, 913 F.3d 152 (D.C. Cir. 2019), the D.C. Circuit rejected a constitutional challenge to 18 U.S.C. § 922(g)(1). The appellant, Medina, had grossly misrepresented his income on a mortgage finance application in 1990, he was referred for criminal prosecution by the bank, and he pled guilty to a felony count of making a false statement to a lending institution in violation of 18 U.S.C. § 1014. *Id.* at 154. Twenty-seven years later, he sought to own a firearm, but was barred from doing so by 18 U.S.C. § 922(g)(1). *Id.* He argued that "the application of this law to him violates the Second Amendment because he poses no heightened risk of gun violence." *Id.*

To resolve the issue, the Circuit applied what it referred to as "the familiar two-step Second Amendment analysis used by circuits throughout the country." *Id.* at 156. "The first step requires us to consider whether the challenged law regulates conduct 'outside the Second Amendment's protections. . . .' If so, [the] inquiry ends, and only rational basis scrutiny applies. If the law regulates activity protected by the Second Amendment, however, the second step of the analysis shifts the burden to the government to show that the regulation is substantially related to an important governmental objective." *Id.*

For the first step of the analysis, the Circuit looked to "tradition and history" to resolve whether barring Medina from possessing firearms offended the Second Amendment. *Id.* at 158. The Court explained that "[t]he Second Amendment was ratified in 1791, so we look to the public understanding of the right at that time to determine if a convicted felon would fall outside the scope of its protection." *Id.* Through this lens, it determined that "it is difficult to conclude that the public, in 1791, would have understood someone facing death and estate forfeiture [the punishment for a felony crime] to be within the scope of those entitled to possess arms." *Id.* Then the Circuit examined whether historical evidence suggested that only dangerous persons could be disarmed,

3

finding that "the public in the founding era understood that the right to bear arms could exclude at least some nonviolent persons." *Id.* at 158–59.  Because the Court "conclude[d] that convicted felons are excluded from the scope of the Second Amendment, and that nothing about Medina's crime distinguishes him from other felons," it found that 18 U.S.C. § 922(g) was constitutional as applied to him. *Id.* at 161.  The Court of Appeals did not need to, and in fact did not, proceed to step two of the analysis to decide whether the regulation was substantially related to an important governmental objective. *Id.*

The D.C. Circuit's ruling was entirely consistent with Supreme Court precedent at the time. In *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008), the Court emphasized that "[l]ike most rights, the right secured by the Second Amendment is not unlimited."

> From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose . . . .
> [N]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill . . . .

*Id.* at 626–27.  This proposition remains unchanged.

Defendant maintains that the D.C. Circuit's holding in *Medina* is "no longer controlling or persuasive" in light of the Supreme Court's decision in *New York State Rifle & Pistol Association, Inc. v. Bruen*.  Mot. at 6, 27.  He submits that "the D.C. Circuit has never engaged in the extensive historical analysis that *Bruen* demands" and that "*Bruen* upended the constitutional framework for reviewing firearm regulations, [so] this Court can no longer rely on conclusions drawn by cases that failed to apply the new, controlling framework." Mot. at 6.  But *Bruen* did not overrule, and it is not inconsistent with, *Medina*.

In *Bruen*, the Supreme Court declined to adopt the "'two-step' framework for analyzing Second Amendment challenges that combines history with means-end scrutiny."  142 S. Ct. at 2125–26.  Rather, it found that "the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation.  Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command."  *Id.* at 2126 (internal quotation marks omitted).  It summarized its ruling as follows: "Despite the popularity of [the] two-step approach, it is one step too many.  Step one of the predominant framework . . . demands a test rooted in the Second Amendment's text, as informed by history.  [Our precedent does] not support applying means-end scrutiny in the Second Amendment context."  *Id.* at 2127.

*Medina* would only cease to bind this Court if a subsequent Supreme Court case "effectively overrule[d]" or "eviscerate[d]" that case.  *See  Perry v. Merit Sys. Prot. Bd.*, 829 F.3d 760, 764 (D.C. Cir. 2016) (internal quotation marks omitted), *rev'd on other grounds*, 582 U.S. 420 (2017).  But as at least two other courts in this district have already found, the Supreme Court's conclusion in *Bruen* changes nothing about the *Medina* analysis because the D.C. Circuit did not engage in the second step – the means-end scrutiny – that *Bruen* rejected.  *See* Op. and Order at 2–4, *United States v. Whittaker*, Case No. 22-cr-272  (D.D.C. Jan. 12, 2023) (ECF No. 33); Draft Tr. at 14–17, *United States v. Tatum*, Case No. 22-cr-120 (D.D.C. Mar. 22, 2023).

It is also important to note that the majority in *Bruen* repeatedly described the petitioners before the Court as "two ordinary, law-abiding, adult citizens," before turning to the question of whether the Second Amendment protected their proposed course of conduct.  142 S. Ct. at 2134; *see* 142 S. Ct. at 2122, 2125, 2138, 2150.  The opinion did not address section 922(g)(1) directly, but it stated that "nothing in our analysis should be interpreted to suggest the unconstitutionality

5

of the 43 States' 'shall-issue' licensing regimes . . . [which] are designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'" *Id.* at 2138 n.9, quoting *Heller*, 554 U.S. at 635.  The Court then reiterated the point, hearkening back to its prior recognition that while "[t]he Second Amendment guaranteed to 'all Americans' the right to bear commonly used arms in public," this right is "subject to certain reasonable, well-defined restrictions." *Id.* at 2156, citing *Heller*, 554 U.S. at 581.

Furthermore, in a concurring opinion which was joined by Chief Justice Roberts, Justice Kavanaugh took pains to assuage any concerns that the Court's decision would disrupt the legality of gun regulations applied to individuals convicted of felony offenses.  Citing the majority opinions in *Heller*, 554 U.S. at 636, and *McDonald v. Chicago*, 561 U.S. 742 (2010), and quoting Justice Scalia's language in *Heller,* including the sentence about "longstanding prohibitions on the possession of firearms by felons," he wrote:

> [A]s *Heller* and *McDonald* established and the Court today again explains, the Second Amendment "is neither a regulatory strai[t]jacket nor a regulatory blank check." [*Bruen*, 142 S. Ct. at 2133].  Properly interpreted, the Second Amendment allows a "variety" of gun regulations.

*Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., concurring), citing *Heller*, 554 U.S. at 636.  Justice Alito's concurrence was similarly emphatic: "[n]or have we disturbed anything that we said in *Heller* or *McDonald v. Chicago*, 561 U.S. 742, about restrictions that may be imposed on the possession or carrying of guns." *Id.* at 2157 (Alito, J., concurring) (internal citations omitted).

Finally, although the defendant relies heavily on the Third Circuit's reasoning in *Range v. Attorney General United States of America*, that case is not binding on this Court, and it cannot supersede the governing authority in this Circuit.  Even if the Court did have the power to vary from *Medina*, the Third Circuit's decision supplies no reason to do so.  In the previous case that

brought Range within the federal prohibition, Range had pled guilty to one count of making a false statement to obtain food stamps in violation of Pennsylvania law. *Range*, 69 F.4th at 98. When Range pled guilty in 1995, his conviction was classified as a Pennsylvania misdemeanor, but punishable by up to five years of imprisonment. *Id.* He was sentenced to three years of probation, and paid restitution and a fine. *Id.* In 2021, Range brought a civil action in the U.S. District Court for the Eastern District of Pennsylvania, seeking a declaration that section 922(g)(1) violates the Second Amendment "as applied to him." *Id.* at 99. In a decision issued prior to *Bruen*, the district court in Pennsylvania held that "Range's crime was 'serious' enough to deprive him of his Second Amendment rights." *Id.*

The Third Circuit reversed en banc, interpreting and applying the analytical framework used by the Supreme Court in *Bruen* and finding that "the Government has not shown that the Nation's historical tradition of firearms regulation supports depriving Range of his Second Amendment right to possess a firearm." *Id.* at 106. But it made it clear that its finding was limited:

> Our decision today is a narrow one. Bryan Range challenged the constitutionality of 18 U.S.C. § 922(g)(1) only as applied to him given his violation of 62 Pa. State Ann. § 481(a). Range remains one of "the people" protected by the Second Amendment, and his eligibility to lawfully purchase a rifle and a shotgun is protected by his right to keep and bear arms. Because the Government has not shown that our Republic has a longstanding history and tradition of depriving people like Range of their firearms, § 922(g)(1) cannot constitutionally strip him of his Second Amendment rights.

*Id.*

In sum, the *Range* ruling was limited to the particular factual circumstances before the court, and it did not purport to vitiate the federal felon in possession prohibition in all instances. While the Third Circuit ruled that people like Range could not be deprived of their firearms under 18 U.S.C. § 922(g)(1), Gorham is not like Range. He was found with a gun and extended magazine

after he had previously been convicted of a violent felony for which he served jail time, *see United States v. Gorham*, Case No. 2007-CF3-396 (D.C. Super. Ct. 2008), and after he had been previously convicted of and served jail time for this exact offense. *See United States v. Gorham*, No. 18-cr-008 (RDM) (D.D.C. 2018).

For all of these reasons, defendant's motion to dismiss the indictment [Dkt. # 50] is **DENIED**.

**SO ORDERED**.

AMY BERMAN JACKSON
United States District Judge

DATE: March 19, 2024